Filed 6/10/21  P. v. Mercier CA4/1
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D077320 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE389186) |
| JEANNIE ELLEN MERCIER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed.

Andrea S. Bitar, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

Jeannie Ellen Mercier was supposed to care for her elderly aunt, who was diagnosed with dementia and moved into an assisted living facility. Despite receiving payments from her aunt's long-term care insurance

company covering her aunt's expenses at the facility, Mercier failed to pay her aunt's bills. She cashed out her aunt's savings account and spent her pension and Social Security income, mostly on casino and Facebook expenses. When her aunt died, her bank accounts were empty, and she owed the assisted living facility over $34,500.

A jury convicted Mercier of various theft-related offenses. On appeal, Mercier contends her constitutional due process rights were violated by the prosecution's delay in bringing charges against her, but she fails to establish prejudice from any delay, which was reasonably attributable to law enforcement's investigation of the allegations. Mercier also contends the trial court erred in denying her motion for judgment of acquittal (Pen. Code, § 1118.1),[1] arguing she had a good faith belief she was entitled to her aunt's money as compensation for taking care of her over the years. However, the evidence presented at trial adequately supports the inference that Mercier had the felonious intent required to support the convictions. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A felony complaint filed in March 2019 charged Mercier with financial elder abuse (§ 368, subd. (e); count 1), grand theft (§ 487, subd. (a); count 2), theft by embezzlement (§ 506; count 3), and identity theft (§ 530.5, subd. (a); count 4). The complaint alleged the charged crimes were related felonies, a material element of which was fraud, and that the resulting loss exceeded $100,000, within the meaning of section 186.11, subdivision (a)(3), and further alleged that Mercier would not be eligible for probation because she unlawfully took in excess of $100,000 in the commission of the charged crimes, within the meaning of section 1203.045.

---

[1]     Statutory citations are to the Penal Code.

2

At trial, the prosecution established that the victim, Delores M., had worked for Pacific Bell for about 30 years before retiring in 1988. She owned a home in San Diego where she had lived since 1968. She received income from Social Security and a pension. She also owned stocks and had other investments. She had an insurance policy for long-term care and a life insurance policy. By 2001, her husband had passed away, and Delores lived alone.

Mercier—Delores's niece—moved in with her in 2001. At the time, Mercier was in her mid-40's, and Delores was around 70 years old. Mercier did not pay rent. In 2004, Mercier borrowed $2,000 from her sister S. Anderheggen. Mercier told Anderheggen she needed the money for textbooks, fixing the brakes on her truck, and a few other things, which did not seem unusual to Anderheggen until she learned that Mercier had also borrowed $2,000 from Delores, purportedly to pay the same expenses. Mercier only repaid Anderheggen half of what she borrowed. Anderheggen testified that there were times when Mercier was working full time but did not have money to pay expenses like car repairs or insurance, and Mercier would ask her aunt for money.

In 2004, Delores executed a notarized power of attorney designating Mercier with the power of attorney and Anderheggen as the successor power of attorney in the event Delores died or became incapacitated. That same year, Delores also executed a trust agreement indicating that her property was to be distributed evenly between Mercier and Anderheggen upon Delores's death. Mercier was designated as the trustee and Anderheggen was designated as the successor trustee.

Mercier became unemployed in 2012.

3

In 2013, Delores suffered from anxiety, deteriorating eyesight, and other health problems. In December of that year, Mercier called the paramedics after Delores fell and was unable to get up. Delores spent three to four weeks in a skilled nursing facility during December 2013 and January 2014. Anderheggen and Mercier went through Delores's documents at that time, to get Delores's "affairs in order," because they believed she was near the end of her life. When Anderheggen visited Delores at the nursing facility, Delores seemed "pretty much comatose." Anderheggen did not believe Delores could manage her own care or finances. Mercier told Anderheggen a doctor had diagnosed Delores with dementia or Alzheimer's.

Anderheggen recalled from the documents she reviewed at that time that Delores had "substantial amounts" in her bank accounts, perhaps around $50,000. Mercier later gave Anderheggen $10,000 as her half of Delores's money, but Anderheggen subsequently gave $8,800 of that money back when Mercier claimed she needed it to pay Delores's monthly expenses. At that time, Anderheggen did not suspect Mercier was committing financial abuse.

Anderheggen testified that, after January 2014, Delores's health improved. Still, her eyesight and hearing were poor, and her dentures needed repair. Anderheggen felt Delores was not being appropriately cared for and wanted to have her dentures and hearing aids repaired and her eyesight checked, but Mercier, who was in control of Delores's finances, resisted. When Delores was lucid, she would express anxiety about her financial situation to Anderheggen. Anderheggen testified that, "during her lucid moments[, Delores] knew what her financial status was and she knew what [Mercier's] habits were, so she was concerned."

4

In February 2014, Delores moved into an assisted living facility. John Gaidry, an internal medicine doctor with a practice in geriatrics, reviewed the physician's report prepared in January 2014 for Delores's admission to the assisted living facility. Delores was diagnosed with dementia with behavioral disturbances, difficulty walking, and abnormal posture. Delores was described as exhibiting "[c]onfused, disoriented, inappropriate behavior, aggressive behavior, [sun]downing behavior, . . . [ability] to follow instructions, depress[ion]." In January 2014, Dr. Gaidry signed a letter noting that Delores was no longer able to make personal, medical, or financial decisions. Dr. Gaidry did not independently recall treating Delores, but based on the information in the medical records, he opined that a patient in Delores's condition would be capable of reliably conveying her emotional state but would be incapable of understanding the nature and consequences of gifting property.

In June or July 2014, Anderheggen approached San Diego County Adult Protective Services as well as local police and sheriff's departments because she suspected Mercier was taking advantage of her position as the power of attorney. In September 2014, she confronted Mercier with allegations of lack of care and mismanagement of finances and requested an accounting of Delores's funds. In October 2014, Mercier sent Anderheggen an e-mail stating that Delores had been diagnosed by three separate doctors as having advanced dementia and that Delores was incapable of making her own financial decisions. Mercier acknowledged that Anderheggen wanted to receive Delores's bank records, and threatened to obtain a restraining order preventing Anderheggen from contacting Mercier. Around that time, when Delores wanted to change her power of attorney designation from Mercier to

5

Anderheggen, Anderheggen helped Delores speak with an administrator at the assisted living facility, but they were unsuccessful in making a change.

At trial, the prosecutor showed Anderheggen checks drawn from Delores's account, dated between March and December 2014 and made payable to Delores or to Mercier. Anderheggen testified the handwriting appeared to be Mercier's and that Delores would have been unable to write checks during that time because her hands shook and her sight was poor.

K. Franklin, the administrator at the assisted living facility, testified that Delores was a resident at the facility from February 2014 until August 2015. Facility documents indicated that Mercier was the responsible party for Delores for financial and healthcare purposes. According to Franklin, Mercier visited Delores once or twice a month ("if that") and sometimes brought her food. The facility billed Delores's monthly invoices to Mercier but also submitted them for payment to Delores's insurance company. Franklin understood that the insurance company would send Mercier a check for Delores's benefit, and Mercier would then write a check to the assisted living facility. In May 2014, Franklin noticed that payments were not being made. When questioned, Mercier told Franklin she was not receiving payments and suggested the insurance company was not receiving the invoices. Franklin tried to work with Mercier to straighten out the payment issue and "wanted to believe that [Mercier] was . . . working with [the insurance company] to help get payments," but when Franklin ultimately contacted the insurance company, they confirmed they had made a payment for each billing period. Because of the missed payments from Mercier, Delores was "downgraded" from a private room to a shared room. When Delores left the facility, she had outstanding balances exceeding $34,500.

6

Mercier moved to Oregon in May 2015. She moved Delores to Oregon to live with her in August 2015. Delores died in October 2015. The cause of death was listed as Alzheimer's disease. When she died, she had no cash remaining in her accounts and there were no proceeds from the sale of her home. Delores's life insurance policy paid $17,000, of which Anderheggen received $5,000.[2] There was no other distribution of Delores's estate.

K. Ingram, a senior specialist with San Diego County Adult Protective Services (APS), first received a referral regarding Delores from her sister (Mercier's mother) in June 2014. When Ingram met with Delores at the assisted living facility, Delores told her she was concerned that Mercier was spending her money and living in her home, which had a reverse mortgage on it. Ingram interviewed Mercier by phone. Mercier provided Ingram with "a lot of . . . background information on [Delores] and her medical problems and how she ended up in the facility" but did not talk about the financial abuse allegations. They agreed to speak again. In a subsequent conversation, Mercier told Ingram she had cashed out $50,000 of Delores's savings and spent it on "household bills" and "bills for . . . Delores," and she was using Delores's Social Security and pension of $2,200 per month "to pay the bills and to live on." Mercier did not notify the mortgage company that Delores was no longer in the home because the house "was going to be willed to her." Mercier told Ingram Delores's long-term care policy paid $188 per day for Delores's care, which she claimed cost $130 per day.

Mercier's disclosures caused Ingram concern; she told Mercier the money she managed for Delores had to be used or saved for Delores's benefit, that she should notify the reverse mortgage company Delores was no longer

---

[2]     Anderheggen agreed to receive $5,000, instead of the $8,500 she was entitled to, because Mercier said she needed the money to repair her truck.

living in the home, and that she should keep complete and accurate records of Delores's finances and how she managed them. Ingram informed Mercier that she wanted to meet to discuss her management of her aunt's finances, and they made an appointment to meet in person; however, Mercier later called to postpone that meeting.[3] They never met in person.

Based on her conversations with Mercier, Ingram confirmed the allegations of financial abuse. In July 2014, Ingram referred the case to the California Department of Justice.[4]

In September 2014, a special agent with the California Department of Justice Bureau of Medi-Cal Fraud and Elder Abuse, Jeffrey Colburn, was assigned to investigate an allegation of financial abuse of Delores by Mercier. Special Agent Colburn interviewed Mercier's mother, the reporting party, who informed him that Mercier was spending Delores's money. In January 2015, he interviewed Delores at the assisted living facility.[5] Delores told him she did not give Mercier permission to spend Delores's money, except to pay for Delores's doctor visits and prescription medications.

---

[3]    Mercier's attorney contacted Ingram to schedule an appointment, but Ingram did not return the attorney's call. At trial, Ingram could not recall why she did not call the attorney other than stating that "our cases are confidential."

[4]    Ingram also made referrals to the local police department and the San Diego County Public Guardian, an agency which conducts investigations and petitions the court for conservatorship of individuals unable to manage their funds.

[5]    Special Agent Colburn testified that he made sure to interview Delores in the morning based on the reporting party's advice that Delores was more "with it" earlier in the day. He acknowledged that Delores seemed "somewhat confused at times" but she was able to answer some of his questions and "her answers were appropriate."

8

Special Agent Colburn obtained records from a local casino showing that, during 2013, Mercier deposited and/or played approximately $170,000 and received back approximately $172,000, with an approximate net win of $1,500. During 2014, Mercier deposited and/or played approximately $422,000 and received back approximately $407,000, with an approximate net loss of $14,000.[6] A representative from another local casino testified that, during 2013, Mercier won nearly $15,000 worth of jackpots but experienced a net loss of over $10,600 and, during 2014, she won over $61,000 worth of jackpots but experienced a net loss of over $14,700.

During his investigation, Special Agent Colburn was unable to uncover any information that showed Mercier was gainfully employed.

In February 2015, Special Agent Colburn obtained a search warrant for Delores's and Mercier's bank records. This initial warrant sought bank documents from December 1, 2013 through January 31, 2015. Colburn subsequently suffered an accident at work, which resulted in the case being reassigned to Investigative Auditor Kelvin Trieu in March 2016. Investigative Auditor Trieu obtained additional records dating from January 31, 2015 through December 31, 2015. He began reviewing and analyzing the subpoenaed bank records on November 1, 2016.[7]

---

[6]    These amounts were confirmed through the testimony of the casino's marketing strategy manager based on the casino's electronic records.

[7]    At trial, Trieu testified that he "lost count" of the pages of bank records he analyzed in connection with the case. There were 200 pages of bank statements alone. Each transaction reflected on the bank statements was accompanied by supporting documentation and receipts. He last received financial records from the bank in August 2018; before this, he was unable to complete his analysis.

Delores and Mercier had accounts at the same bank.[8]  There were also two credit card accounts.  Investigative Auditor Trieu testified that, for purposes of efficiency, and due to his lack of knowledge with respect to charges incurred prior to the statement periods, he attributed all payments made to the credit card accounts as being made for Delores's benefit.  He further testified that, in performing his analysis, he strove to be "conservative and consistent," and when he was confronted with questionable payments (for example, for credit card payments, gasoline, or bank fees), he attributed them as being made "for the benefit of Delores."

Investigative Auditor Trieu's investigation revealed that an insurance company made payments of over $75,500 on Delores's long-term care policy, but only about $64,000 of those payments were deposited into Delores's bank accounts.  Initially, the checks were issued to Delores at her San Diego home address, where Mercier was living.  Beginning in May 2015, when Mercier moved to Oregon, the checks were sent to an Oregon address.

The bank records reflected Delores received income payments from Social Security and her pension.  Through his analysis of bank account transactions, Investigative Auditor Trieu determined that Mercier spent over $122,250 on casino and Facebook expenses during the 16-month period from January 2014 through April 2015 (when Delores was in the assisted living facility).  Analyzing the bank records and financial information spanning the entire two-year period, Investigative Auditor Trieu concluded that Mercier

---

8    Delores's account had five "subaccounts":  a primary savings account, a checking account, an "11-month liquid certificate," a money market and savings accounts, and credit card account.  Mercier's account had two "subaccounts":  a checking and a savings account.  Delores was listed as a joint owner of Mercier's account.

"overspent" approximately $161,000 of Delores's money on payments not made for Delores's benefit.

During his investigation, Investigative Auditor Trieu provided financial documents to an investigator from the Medicaid Fraud Unit of Oregon's Department of Justice; that investigator interviewed Mercier in Oregon in April 2017. Mercier told the investigator she had moved from Oregon to California in 2001 to live with Delores and, since 2012, was not employed, but rather spent her time taking care of her aunt. The investigator showed Mercier documents reflecting financial transactions from her and Delores's bank accounts. Mercier admitted that she had made the casino and Facebook expenditures reflected in the records during the time her aunt was living at the facility. Mercier said she felt the money "was compensation . . . she was owed for the time that she had spent prior to her aunt going into the nursing home, taking care of her aunt." Mercier told the investigator she believed she was entitled to $300 per month for "power of attorney fees," and that she went to the casinos because she needed a break from taking care of her aunt. Mercier also admitted she made expenditures from Delores's account to her son's prison trust account when Delores was living in the facility. She told the investigator that Delores had sent her son money before and so she continued to send it after Delores moved into the facility. Mercier eventually told the investigator "she figured that maybe she had spent money that she shouldn't have."

An attorney and law professor specializing in trust and estate law testified as an expert for the prosecution. He testified that the power of attorney, also known as an attorney in fact or agent, has a responsibility to hold and maintain the principal's assets for the benefit of the principal and to act on the principal's behalf, for the principal's benefit. The agent owes five

11

legal duties to the principal: to observe the standard of care that a prudent person would observe in dealing with the property of another person; to ensure that the principal's assets are kept in the principal's name and are not commingled with the agent's own assets; to act solely in the principal's interest and for the benefit of the principal and to avoid conflicts of interest; to communicate so that the principal is aware of what the agent is doing and the agent knows what the principal wants; and to maintain receipts and records for transactions conducted on the principal's behalf. An agent is entitled to reasonable compensation, which in San Diego is around $30 to $40 per hour.

The expert testified that the only services Mercier properly performed as Delores's agent when Delores was living in the facility were ensuring the invoices were sent to the insurance company and depositing the insurance checks. These services could not have accounted for over $160,000 in reasonable compensation. The expert would allocate one hour per month for these services.

The expert testified that it would be a violation of the agent's legal duties to accept a gift from the principal, knowing the principal lacked the capacity to gift it. An agent who uses a principal's money to gamble at a casino is violating her legal duties by acting outside the standard of care of what a prudent person would do in dealing with another's property, by failing to act solely in the principal's interest, and by creating a conflict of interest.

Two witnesses were called to testify for the defense. A. Castillo was employed as a certified nursing assistant and medical technician at the assisted living facility when Delores lived there. Castillo testified she took care of Delores; they were very close and had a good relationship. Castillo saw Mercier at the facility once or twice a week. Mercier visited more often

12

in the beginning and "in the end not so much because she was working on the house." Mercier frequently brought Delores food, and if Delores requested anything, like pants, a shirt, or skin cream, Castillo would call Mercier, and Mercier would bring it. Castillo was surprised when Mercier moved Delores from the facility because Delores was happy there.

Delores's long-time friend, B. Potter, testified she visited Delores at the assisted living facility several times. Potter recalled that every time she visited Delores, Delores stated she did not want to die in the facility, and she wanted to go to Oregon with Mercier. Potter emphasized the facility was a "happy" and "nice" place, but Delores did not want to stay there.

During closing arguments, the prosecutor argued the evidence overwhelmingly supported the conclusion that Mercier stole well in excess of $100,000 of her aunt's money and used it for her own purposes—mostly casino gambling and Facebook—while failing to pay her aunt's bills, causing Delores to be downgraded to a shared room at the assisted living facility, and ultimately moved Delores away to Oregon, where she died in debt. The defense argued Mercier was open and honest with investigators about spending the money and truthfully believed she was entitled to it as compensation for taking care of her aunt during the years before she moved into the assisted living facility.

The jury found Mercier guilty on all counts and found true the allegation that her conduct resulted in a loss exceeding $100,000 with respect to counts 1 through 3 only. The trial court struck the section 186.11 allegation "for all purposes" as to each of the counts and sentenced Mercier to the midterm of two years on count 2 and imposed but stayed terms on counts 3 and 4.

13

DISCUSSION

I

*Precharging Delay*

A. *Applicable Law*

"A defendant's state and federal constitutional speedy trial rights (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15, cl. 1) do not attach before the defendant is arrested or a charging document has been filed. [Citation.] Nonetheless, a defendant is not without recourse if a delay in filing charges is prejudicial and unjustified. The statute of limitations is usually considered the primary guarantee against overly stale criminal charges [citation], but the right of due process provides additional protection, safeguarding a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence [citation]." (*People v. Abel* (2012) 53 Cal.4th 891, 908 (*Abel*).) "A defendant seeking relief for undue delay in filing charges must first demonstrate resulting prejudice, such as by showing the loss of a material witness or other missing evidence, or fading memory caused by the lapse of time." (*Ibid*.)

"A [due process] claim based upon the federal Constitution requires a showing that the delay was undertaken to gain a tactical advantage over the defendant." (*People v. Catlin* (2001) 26 Cal.4th 81, 107; see *United States v. Lovasco* (1977) 431 U.S. 783, 795 (*Lovasco*).) Under California constitutional standards, both negligent and purposeful delay in bringing charges may, "when accompanied by a showing of prejudice, violate due process." (*People v. Nelson* (2008) 43 Cal.4th 1242, 1255 (*Nelson*).) However, if the delay was

14

merely negligent, a greater showing of prejudice is required to establish a due process violation.  (*Id*. at pp. 1255-1256.)

Because California law is at least as favorable for the defendant with respect to the justification for the delay, California courts apply the California constitutional due process standard.  (*People v. Cowan* (2010) 50 Cal.4th 401, 430-431 (*Cowan*); *Nelson*, *supra*, 43 Cal.4th at p. 1251 ["[T]he exact standard under [the federal] Constitution is not entirely settled" but California law "is at least as favorable for defendant in this regard," so "we can and will apply California law."].)

"If the defendant establishes prejudice, the prosecution may offer justification for the delay; the court considering a motion to dismiss then balances the harm to the defendant against the justification for the delay." (*Nelson*, *supra*, 43 Cal.4th at p. 1250.)  If the defendant does not establish prejudice, there is no need for the court to determine if the delay was justified or engage in the balancing process.  (*Serna v. Superior Court* (1985) 40 Cal.3d 239, 249 (*Serna*).)

"Prejudice is a factual question to be determined by the trial court. (*People v. Hill* (1984) 37 Cal.3d 491, 499 (*Hill*).)  "We review for abuse of discretion a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation], and defer to any underlying factual findings if substantial evidence supports them [citation]."  (*Cowan*, *supra*, 50 Cal.4th at p. 431.)

B.  *Additional Background*

APS specialist Ingram first received a referral regarding Delores in June 2014.  After investigating, Ingram referred the case to the California Department of Justice, the local police department, and the San Diego County Public Guardian in July 2014.

15

Special Agent Colburn of the California Department of Justice was assigned to the case in September 2014. He interviewed Delores at the assisted living facility in January 2015. Colburn obtained records from local casinos demonstrating that Mercier had gambled significant sums of money during 2013. In February 2015, Special Agent Colburn obtained a search warrant for Delores's and Mercier's bank records. In May 2015, Mercier moved to Oregon and then moved Delores to Oregon, where she died in October 2015.

Special Agent Colburn suffered an accident at work which prompted the reassignment of the case to an investigative auditor in March 2016. The investigative auditor obtained a second search warrant for bank records covering an expanded scope of time, and, in November 2016, the auditor began an extensive analysis of the financial documents, which were so numerous the auditor "lost count" of the number of pages.

After receiving some of the documents and information from California's investigators, an investigator from the Oregon Department of Justice interviewed Mercier in April 2017 in Oregon. Mercier claimed to have been unemployed and caring for Delores since 2012. Mercier admitted she had made the gambling and Facebook expenditures, claimed she considered that money to be compensation for time she spent as Delores's caregiver, and acknowledged that "maybe she had spent money that she shouldn't have."

The investigative auditor from California's Department of Justice received a final batch of financial records from the bank on August 14, 2018; only then was he able to complete his analysis.

A warrant for Mercier's arrest was issued in March 2019, and in May she was arrested in Oregon and extradited to California. Mercier's trial was conducted during November and December 2019.

Prior to trial, Mercier moved to dismiss the case, claiming the delay in bringing the charges violated Mercier's due process rights. Mercier argued that during the delay, Delores died, causing her to be unable to testify in Mercier's defense. Mercier posited that Delores would have "testif[ied] that her niece was permitted to sell her belongings and accept payment for the care [Mercier] provided to [Delores] in her old age . . . ." Mercier further argued that the delay caused witnesses' memories to dim and rendered "key evidence" unavailable, seriously impairing her defense. In opposition, the prosecutor contended Mercier had not demonstrated "actual or substantial prejudice," and further contended that any prefiling delay was reasonably attributable to the duration and thoroughness of law enforcement's investigation. The prosecutor argued that Mercier had been interviewed during the summer of 2014 and thus was on notice regarding allegations of financial abuse. Prior to trial, the trial court indicated its tentative decision was to deny the motion, as Mercier had failed to make a showing of prejudice. The trial court took the matter under submission so that it could consider the evidence offered at trial. At the close of the prosecution's case, counsel renewed Mercier's motion to dismiss for violating her due process rights. The trial court denied the motion, stating, "Any prejudice suffered by the defense is miniscule as it pertains to the issues at hand. There is nothing to suggest that Ms. Mercier's case would have been any better off had it been tried any time sooner than it was. The issue of fading memories pertain[s] to a lot of tangential matters, nothing this [c]ourt deems as pivotal to a determination whether or not this defendant did or did not commit the crimes as alleged."

17

C. *Analysis*

Mercier contends reversal is warranted because the delay in bringing charges violated her due process rights. She argues she suffered prejudice because during the delay, Delores died and the memories of three witnesses faded. Mercier contends that Delores's testimony would have supported Mercier's claim that expenditures were made as compensation for the many years Mercier spent caring for Delores. Evidence indicated that by January 2014—months before initial allegations of wrongdoing were made in June 2014—Delores's dementia was so advanced that she was already incapable of making personal, medical, and financial decisions, and Mercier, as her power of attorney and designated trustee, was entrusted with responsibility for Delores's finances. Consistent with the expert's testimony, even if Delores had gifted her money to Mercier at this point, it would have been a violation of Mercier's duties to accept the gift knowing that Delores lacked the capacity to gift it. Moreover, Mercier's contention that Delores's testimony would have been favorable to her defense is contradicted by Delores's statements to Special Agent Colburn in January 2015 that Mercier did not have permission to spend her money, except to pay medical expenses. There is no evidentiary support for Mercier's claim that, had Delores been capable of testifying, her testimony would have supported Mercier's defense. Mercier's claim of prejudice on this basis is purely speculative. (*People v. Jones* (2013) 57 Cal.4th 899, 923 (*Jones*) [trial court properly rejects claim of precharging delay where defendant's "evidence of prejudice is speculative"].) Based on Delores's statements to Mercier's sister and the APS specialist, there was no reason to believe that Delores "would have supplied exonerating, rather than incriminating, evidence" if she had testified at trial. (*People v. Cordova* (2015) 62 Cal.4th 104, 120.)

18

Mercier further argues that she was prejudiced because three witnesses had lapses of memory when they testified at trial. She fails to demonstrate, however, how any witness's memory lapse caused her prejudice. The first witness, Dr. Gaidry, the admitting physician at the assisted living facility, had no independent recollection of treating Delores, but he was able to rely on records completed at the time he provided services to provide relevant testimony. Mercier claims the doctor was unable to provide "specific testimony regarding [Delores's] mental state," but he testified regarding Delores's documented dementia diagnosis and explained that she exhibited "[c]onfused, disoriented, inappropriate behavior, aggressive behavior, [sun]downing behavior," and depression. Dr. Gaidry also testified regarding his records which documented Delores's inability due to dementia to make personal, medical, or financial decisions. Although he could not independently recall treating Delores, Dr. Gaidry was able to opine, based on the information contained in the medical records, that a patient in Delores's condition would be capable of reliably conveying her emotional state but would be incapable of understanding the nature and consequences of gifting property.

The second witness, K. Franklin, an administrator at the assisted living facility where Delores was admitted in February 2014, could not independently remember how long Delores stayed at the facility or specific details regarding payment for Delores's care, but she was able to refer to facility records that established that Mercier was the responsible party for Delores for financial and healthcare purposes. She recalled missed payments on Delores's behalf and further recalled working with Mercier to ensure the insurance company received the monthly invoices. She testified she "wanted to believe that [Mercier] was . . . working with [the insurance company] to

19

help get payments," but when she ultimately contacted the insurance company, it confirmed it had made payments for each billing period—casting doubt on Mercier's suggestion that the insurance company was to blame for the missed payments. She further recalled that, due to the missed payments, Delores was "downgraded" from a private room to a shared room.

The third witness, K. Ingram, the APS specialist who performed the initial investigation and referral of the case, was unable to independently recall some specific information relating to the investigation, but she was able to refresh her memory with her notes and report prepared in connection with that investigation. She testified that she confirmed the allegations of financial abuse based on Mercier's statements that she had cashed out $50,000 of Delores's savings and spent it on "household bills" and "bills for . . . Delores," and that she was using Delores's Social Security and pension "to pay the bills and to live on."

Although these three witnesses were unable to recall certain specific facts during their testimony, each was able to refresh his or her recollection with documents and was thereafter able to testify regarding relevant material facts. "Prejudice to a defendant from precharging delay is not presumed." (*Abel, supra*, 53 Cal.4th at pp. 908-909.) Mercier failed to make an affirmative showing of prejudice here and her conclusory statements regarding the witnesses' faded memories are insufficient to meet her burden. (See *id.* at p. 909 ["defendant made no showing that [a witness's] recall would have been more specific had she been contacted earlier"]; *Serna, supra*, 40 Cal.3d at p. 250 [showing of actual prejudice " 'must be supported by particular facts' " and not " 'by bare conclusionary statements' "].) As to Dr. Gaidry, Mercier contends he "could only testify as to generalities" rather than provide "specific testimony regarding [Delores's] mental state." But as

20

already noted, the doctor was able to refresh his recollection and testify based on contemporaneously prepared medical records documenting Delores's condition. Mercier does not explain how additional testimony regarding Delores's mental state while at the assisted living facility would benefit, rather than harm, her defense. Mercier's arguments regarding the remaining witnesses are similarly conclusory and speculative. She contends the administrator did not independently remember how long Delores stayed at the assisted living facility or "details . . . regarding payment for [Delores's] care." But she does not explain why these details were needed to establish the amount of funds Mercier spent on herself, as she contends, or why the actual financial records available to her (and her own admissions) were not sufficient for this purpose. And while Mercier contends the APS specialist "could only proceed based on her notes or her report," she acknowledges the witness was able to refresh her recollection. As already discussed, this witness was able to testify on relevant issues.

In sum, Mercier does not adequately explain what evidence was rendered unavailable or how her defense was impaired because of the witnesses' dimmed memories. Mercier has therefore failed to establish any prejudice from the delay. The trial court's determination that any prejudice from the delay was "miniscule" is thus supported by substantial evidence. (*Hill*, *supra*, 37 Cal.3d at p. 499; *Cowan*, *supra*, 50 Cal.4th at p. 431.)

Even assuming Mercier sufficiently established some prejudice due to the lapse in time between the allegations of misconduct and the criminal prosecution, any prejudice was outweighed by the prosecution's need to fully investigate the allegations before bringing charges. "[I]nvestigative delay does not deprive [a defendant] of due process, even if [the] defense might

21

have been somewhat prejudiced by the lapse of time." (*Lovasco, supra,* 431 U.S. at p. 796.)

Mercier contends the investigative delay amounted to a "failure to attend to the case." But the evidence presented at trial demonstrated that there were reasonable explanations for any delay. An initial allegation of financial abuse was made in June 2014 and investigated by APS before that agency made its referral to law enforcement. When Special Agent Colburn initiated an investigation for the Department of Justice, he interviewed Delores, uncovered evidence regarding Mercier's gambling expenditures, and obtained a search warrant for bank records. An accident prompted the case to be transferred to an auditor who thereafter obtained an additional search warrant covering an expanded scope of time. Upon obtaining the financial records, the auditor conducted a painstaking review of voluminous financial documents. Mercier's move out of state required California investigators to coordinate with law enforcement in Oregon, who interviewed Mercier in April 2017. The investigative auditor received a final batch of financial records in August 2018, after which he was able to complete his analysis. Charges against Mercier were filed shortly thereafter in March 2019. As the Attorney General points out, "[Mercier] cannot show negligence simply because her case may not have been the California Department of Justice's highest priority." Indeed, "[a] court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. . . . 'Thus, the difficulty in allocating scarce prosecutorial resources (as opposed to clearly intentional or negligent conduct) [is] a valid justification for delay . . . .' [Citation.] It is not enough for a defendant to argue that if the prosecutorial agencies had made his or

her case a higher priority or had done things a bit differently they would have solved the case sooner." (*Nelson, supra,* 43 Cal.4th at pp. 1256-1257.)

"Against [Mercier's] weak showing of prejudice, the prosecution's justification for the delay was strong. The delay was 'investigative delay, nothing else.' " (*Cowan, supra,* 50 Cal.4th at p. 434.) "Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." (*Lovasco, supra,* 431 U.S. at p. 795; see *Nelson, supra,* 43 Cal.4th at p. 1256 [justification for the delay is strong when there is "investigative delay, nothing else."].) Mercier has not established she was deprived of due process. The trial court did not abuse its discretion when it denied Mercier's motion to dismiss for prejudicial precharging delay. (See *Cowan, supra,* 50 Cal.4th at p. 431.)

## II

### *Motion for Judgment of Acquittal*

At the close of the prosecution's case, Mercier moved to dismiss the case pursuant to section 1118.1. The trial court denied the motion. Mercier now contends that, because she believed in good faith she was entitled to use Delores's funds for herself, she lacked the requisite intent to commit the charged crimes.

Section 1118.1 provides for entry of judgment of acquittal if the evidence is insufficient to sustain a conviction on appeal. (*Jones, supra,* 57 Cal.4th at p. 964.) " 'The test applied by the trial court in ruling on a motion for acquittal is the same test applied by the appellate court in reviewing a conviction for sufficiency of the evidence, namely, to determine whether from the evidence then in the record, including reasonable

inferences to be drawn therefrom, there is substantial evidence of the existence of every element of the offense charged.' " (*Ibid.*)

" 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215 (*Houston*).)

Mercier was convicted on four theft crimes: financial elder abuse, grand theft, theft by embezzlement, and identity theft.

Financial elder abuse makes it a crime for "[a] caretaker of an elder" to commit "theft, embezzlement, forgery, or fraud . . . with respect to the property or personal identifying information of that elder . . . ." (§ 368, subd. (e); CALCRIM No. 1807.) A person is guilty of theft if she "feloniously steal[s or] take[s] . . . away the personal property of another, or . . . fraudulently appropriate[s] property which has been entrusted to . . . her . . . ." (§ 484, subd. (a).)

" ' "The crime of grand theft is complete when a man takes property not his own with the intent to take it, and a defendant may be convicted of grand theft upon proof of facts establishing (a) embezzlement, (b) larceny or (c) obtaining property under false pretenses. . . ." ' " (*People v. Hussain* (2014) 231 Cal.App.4th 261, 272, fn. 5; § 487, subd. (a) [grand theft requires theft of property with a value exceeding $950]; see also CALCRIM Nos. 1800 and 1801.)

Theft by embezzlement occurs when "the owner entrusted property to the defendant, the owner did so because he or she trusted the defendant, the defendant fraudulently converted the property for . . . her own benefit and, in doing so, the defendant intended to deprive the owner of its use." (*People v. Beaver* (2010) 186 Cal.App.4th 107, 121; §§ 503 and 506; see also CALCRIM No. 1806.)

Identity theft requires a showing that "(1) that the person willfully obtain personal identifying information belonging to someone else; (2) that the person use that information for any unlawful purpose; and (3) that the person who uses the personal identifying information do so without the consent of the person whose personal identifying information is being used." (*People v. Barba* (2012) 211 Cal.App.4th 214, 223; § 530.5, subd. (a); CALCRIM No. 2040.)

"The claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery. At common law, a claim of right was recognized as a defense to larceny because it was deemed to negate the . . . intent to steal[] of that offense." (*People v. Tufunga* (1999) 21 Cal.4th 935, 938; § 511 ["Upon any indictment for embezzlement, it is a sufficient defense that the property was appropriated openly and avowedly, and under a claim of title preferred in good faith, even though such claim is untenable. But this provision does not excuse the unlawful retention of the property of another to offset or pay demands held against him."].) The jury was instructed regarding the claim-of-right defense as follows: "If the defendant obtained property under a claim of right, she did not have the intent required for the crime of theft. [¶] The defendant obtained property under a claim of right if she believed in good

25

faith that she had a right to the specific property or a specific amount of money, and she openly took it.  [¶]  In deciding whether the defendant believed that she had a right to the property and whether she held that belief in good faith, consider all the facts known to her at the time she obtained the property, along with all the other evidence in the case.  The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable.  But if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not held in good faith.  [¶]  If you have a reasonable doubt about whether the defendant had the intent required for theft and/or embezzlement, you must find her not guilty of these crimes."  (CALCRIM No. 1863.)

"'[A] bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent.'"  (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 768.)  "'Whether a claim is advanced in good faith does not depend solely upon whether the claimant believes he was acting lawfully; the circumstances must be indicative of good faith.'"  (*People v. Stewart* (1976) 16 Cal.3d 133, 140.)

"The specific intent with which an act is performed is a question of fact."  (*In re Albert A.* (1996) 47 Cal.App.4th 1004, 1008; see *People v. Kranhouse* (1968) 265 Cal.App.2d 440, 449 (*Kranhouse*) ["Obviously, the question of whether defendant possessed the necessary intent to [commit grand theft] was a factual issue.  Whether an act is performed with any particular specific intent is a question of fact for the trier-of-fact, and where there is any substantial evidence to support the trier's finding on such issue, the finding will not be disturbed on appeal."].)

Although the defense argued that Mercier's honesty with investigators about spending the money demonstrated she truthfully believed she was

entitled to it as compensation for taking care of her aunt, the jury was not required to accept this argument. The evidence presented at trial supports the jury's conclusion that Mercier had the felonious intent required to support her conviction for the theft crimes. As the trustee of her aunt's trust, Mercier knew that Delores's property was to be distributed evenly between Mercier and her sister upon Delores's death. Mercier also knew that Delores had been diagnosed with advanced dementia and was incapable of making financial decisions. As power of attorney, Mercier was responsible for her aunt's finances when her aunt was incapacitated and was duty bound to observe a reasonable standard of care with respect to Delores's money and property, to act in Delores's best interest, and to maintain records of transactions conducted on Delores's behalf.

In spite of these responsibilities, Mercier admitted she cashed out Delores's savings and spent her Social Security and pension income. The evidence established that, during the 16-month period when Delores lived in the assisted living facility, Mercier spent over $122,250 of her aunt's money on casino and Facebook expenses. Despite the fact that Delores's long-term care insurance company made payments of over $75,500 to pay for Delores's expenses at the assisted living facility, Mercier neglected to make payments on Delores's behalf, causing Delores to be moved from a private room to a shared room and ultimately leaving Delores (and her estate) with outstanding balances exceeding $34,500. When confronted about the delinquent payments, Mercier lied and suggested the insurance company must not have received the invoices, even though the company received the invoices and made payments for each billing period. Mercier did nothing in response to her sister's requests to help Delores with her medical and dental needs. When her sister requested an accounting of Delores's funds, Mercier

27

refused to provide information and threatened to obtain a restraining order. Meanwhile, Mercier was sending her son money for his prison trust account. After Delores died, Mercier admitted that "maybe she had spent money that she shouldn't have." The jury reasonably rejected Mercier's defense that Delores would have consented to any of this.[9] The evidence presented at trial amply supports the jury's conclusion that Mercier had the felonious intent required to convict her of the charged crimes. (*Kranhouse*, *supra*, 265 Cal.App.2d at p. 449; *Houston*, *supra*, 54 Cal.4th at p. 1219 [concluding the evidence supported the jury's conclusion that the defendant harbored the specific intent required to support the conviction].) The trial court did not err when it denied Mercier's motion for judgment of acquittal. (*Jones*, *supra*, 57 Cal.4th at p. 965.)

---

[9] Mercier tries to support her claim-of-right defense by arguing she was not legally sophisticated. But the evidence at trial is sufficient to establish that Mercier had the requisite intent regardless of her lack of legal sophistication, and she knew Delores did not consent to depleting her bank accounts so Mercier could gamble hundreds of thousands of dollars while Delores died in debt to the assisted living facility.

## DISPOSITION

The judgment is affirmed.

GUERRERO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.